## Case No. 4,925.

### FORBES v. The HANNAH.

[Bee, 348; [1] Hopk. Rep.]

Admiralty Court, D. Pennsylvania. Aug., 1786.

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

HOPKINSON, District Judge.

Judgment. Edward Forbes of Dublin, in Ireland, has libelled against the brig Hannah for the amount of certain bonds of bottomry, which Francis Lewis, then captain and principal owner of the vessel, gave as security for moneys advanced by Forbes, in the port of Dublin, for necessaries, as it is said, for the said brig, and to enable her to complete her voyage. The circumstances of this case appear, from the testimony, to be as follows: Francis Lewis, principal owner of the brig Hannah, had chartered her to one Varlo, for a voyage from America to Dublin. Varlo himself went passenger, with his goods, and Lewis was captain for the voyage. After their arrival at Dublin, Lewis borrowed money of Forbes at three several times; for which he gave three bonds of bottomry on his vessel, amounting, with premium and charges, to £214. 0s. 8d. sterling money of Great Britain. Forbes then put a cargo on board the brig, in which it seems that Lewis was concerned; as he was to have one half of the net profits of the adventure, exclusive of freight, and to be answerable for one half of the loss, if any there should be, on the sales. Lewis left Dublin with this cargo, bound for the city of Boston, in America. But it does not appear by the exhibits, whether he ever arrived at Boston, or what he did with the cargo. It appears, however, that in April last he was with this brig in the port of Philadelphia, at which time his mariners sued in this court for wages due, and the brig was thereupon attached and condemned for payment of wages, amounting to £29., Lewis making no plea or defence against the libel. In consequence of this sentence, a writ issued to the marshal, in the usual form, directing him to sell the brig Hannah, with her tackle, apparel and furniture, or such parts thereof, as might be necessary to satisfy the decree in favour of the mariners, together with the costs and charges of suit. But Lewis requested the marshal to sell the whole of the vessel, with her tackle, &c. under the decree, and even indorsed this request upon the writ of sale: and to prove that he was the sole owner of the brig at that time, he exhibited to and lodged with the marshal, an assignment, or bill of sale, from one Simpson, who had been a part owner, of all his interest in the brig to Lewis. Andrew Hodge, the respondent in the present cause, purchased this vessel at the marshal's sale, and paid down the full consideration money, out of which the marshal deducted the mariner's wages and costs of suit, and paid the balance to Lewis, as sole owner. After this, Lewis went off without saying any thing of the bottomry bonds he had given to Forbes in Dublin. And now these bonds have come over,

and Forbes has attached the brig in the hands of Hodge, the purchaser.

From these circumstances, two questions have arisen, viz. 1st. Whether these bottomry bonds have hypothecated the vessel, according to the rules of maritime law, so as to bring the cause within admiralty jurisdiction? 2d. Supposing it to be so, whether the sale and purchase, under the authority of this court, have not vested the property in the respondent, exonerated of all prior engagements?

To determine the first point, it will be necessary to consider the characteristic marks which distinguish an hypothecation according to the maritime law, from a common bottomry bond or mortgage on a ship, according to the custom of merchants, and cognizable by the common law. By the maritime law, "a master of a ship hath no power to take up money by bottomry, in places where his owners dwell: but when he is out of the country, and where he hath no owners, or any goods of theirs or his own, and cannot find means to take up by exchange or otherwise, and that for want of money the voyage might be retarded or overthrown, moneys may be taken up upon bottomry." Molloy, bk. 2, c. 11, § 11. From this it appears, that the true grounds of a maritime hypothecation are, the necessities of the case, and the want of personal credit. Wherever this doctrine occurs in the books, these two circumstances are strongly pointed out. Thus, in 3 Mod. 244., "The reason of the civil law, which allows the pawning of a ship for necessaries upon the high sea, seems to be plain; because there may be an extraordinary and invincible necessity, to which the admiralty jurisdiction is limited; for, if the law should be otherwise, the master might take as much money as he will." And so the court, in that case, ordered a trial on the necessity. So also in Bridgeman's Case, Hob. 12., a prohibition was granted, because the impawning was not shewn to be occasioned by necessity. In 1 Magens, there is a report of an admiralty suit on a bottomry bond: At the conclusion (page 329), the author says, "Persons living in seaports may learn from this case, not to believe or trust too easily a captain they do not know; and when they propose benefiting themselves by lending money to bottomry, to such whose distresses oblige them to seek it: the lenders, for their own satisfaction and security, ought to have proofs given that there was a necessity for such an advance, and that the money had actually been employed for the purposes alleged."

Further, the impawning must be in foreign parts; that is, where neither the owner, nor master, hath any personal credit. For, this constitutes an essential part of the necessity. "The master can have no credit abroad, but by hypothecation." Salk. 35. "Where a ship in distress is forced into any port where her owners have no correspondents to supply the master with the money necessary to enable him to prosecute his voyage, he may take it on bottomry from those who will advance it on the easiest terms." 1 Mag. 27. The reason is, the maritime law requires that the moneys should be lent solely on the credit of the ship; and that the security of the lender should depend altogether on her safety; and, therefore, if the ship be well engaged, that is, according to the principles stated, she shall be for ever obliged till redemption. Molloy, bk. 2, c. 2, § 15. And, therefore, also, because of the hazard, an unusual interest or premium is allowed on the moneys advanced.

Such are the principles which designate a maritime hypothecation within admiralty jurisdiction. But bottomry bonds may be given by owners for security of mercantile or other debts; and these may be executed either in the places where the owners dwell, or in foreign parts by their order. They may be formed under a variety of circumstances, and depend on many contingencies, according to the conditions or terms of the deed or contract. It should seem, by the necessity so frequently urged as the ground of a maritime hypothecation, that the ship should be driven by distress into some other port than that of her destination; or, at least, that some extraordinary casualty should occasion an unforeseen and inevitable expense in the port of her voyage. Because, it is hardly to be supposed that an owner would send his ship, much less that he would take her himself, to a place where he could not command either money or credit for ordinary repairs and supplies.

In the present case, it does not appear, nor has it ever been suggested, that any extraordinary circumstances occasioned an unforeseen necessity. The captain, Lewis, who was also principal owner, arrives after a prosperous voyage, at the port of destination, with his freighter on board. Here the voyage is completed, and it may be presumed that he then received his freight. If so, he could not be without money sufficient to refit his vessel for a new voyage. And that he was not without personal credit is manifest; because Forbes entrusted him with a new cargo, and agreed to allow him 35s., Irish money, per ton for freight, on all the goods he should deliver; and also, one half of the net profits arising from the sale of the cargo, he to run one half of the risk of loss. This mercantile connexion shews, at least, that Lewis was in some credit with Forbes. Besides, if we look into the accounts, we shall find that the first article charged is for £32. 5s. 6d. sterling paid to Mr. Varlo by Lewis's order, to take up and cancel a former bottomry bond. It seems strange that Lewis, after navigating Varlo and his goods across the sea, should fall in his debt. This circumstance is not at all accounted for; but, be it as it may, Forbes should certainly have forwarded this former bottomry bond, with

an account of the occasion and expenditures for which it was given, that a judgment might have been formed whether it was a proper hypothecation or not; or have shown that the brig was under condemnation of the admiralty at Dublin on account of that bond, and that the £32. 5s. 6d. was paid for her redemption. Upon a view of the circumstances of the present case, I do not find them such as the maritime law requires, to constitute a genuine hypothecation, within admiralty jurisdiction. This point being conclusive, it is unnecessary to determine on the second general question. I adjudge that the bill in this cause be dismissed, and that the libellants pay the costs of suit.

There was an appeal from this decree; but the high court of errors and appeals confirmed the sentence.